UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AUSTIN JAMES OSBORNE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BARRY MINKOW, an individual,<br><br>Defendant. | Case No. 1:25-cv-00647-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is a Motion to Dismiss brought by Defendant Barry Minkow. Dkt. 9. Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary. For the reasons stated below, the Court finds that it lacks specific personal jurisdiction over Minkow. Rather than dismiss the case, pursuant to 28 U.S.C. § 1631, the Court will instead transfer it to the District of Nevada.

## BACKGROUND

Plaintiff Austin James Osborne is a resident of Idaho and the principal of numerous companies headquartered in the state, including Cedar Creek Capital

LLC ("Cedar Creek"). Dkt. 1 at ¶¶ 1, 7. Cedar Creek is a private investment firm that specializes in investments in self-storage facilities. *Id*. at ¶ 8. Cedar Creek has over 600 investors. *Id.* The geographic distribution of these investors is unknown.

Defendant Barry Minkow is a resident of Nevada. Dkt. 9-2 at ¶ 2. Prior to the events that resulted in this litigation, Minkow had no affiliation, interactions or dealings with Osborne or Cedar Creek. Dkts. 1 at ¶ 18, 9-2 at ¶ 10.

Minkow has been convicted of financial fraud-related crimes three times and has served two stints in federal prison. Dkt. 1 at ¶¶ 21-26. After his release in 2018, Minkow opened social media accounts and presents himself as a scam and fraud watchdog. *Id*. at ¶ 26. At the time Osborne filed his Complaint, Minkow had approximately 3,000 followers on LinkedIn, 36,100 followers on Instagram, and 69,500 followers on TikTok. *Id*. at ¶ 17.

Osborne and Cedar Creek ended up in Minkow's crosshairs, and on October 8, 2025, Minkow published a blog post on LinkedIn titled "The Principal of the Path: How AJ Osborne, the Guru of Self-Storage Investing and Owner of Cedar Creek Capital, Failed Geography – and Investors" ("Initial Article"). *Id*. at ¶ 11, Dkt. 1-1.

In the Initial Article, Minkow alleged that Osborne was committing fraud, and that his actions would ultimately result incarceration. Dkt. 1-1. Additionally,

Minkow alleged that the six self-storage properties that comprised Cedar Creek Fund I were encumbered with four cross-collateralized loans, and that three of the properties had extremely high loan to value ratios ("LTV"), such that they were underwater. *Id*.

Shortly after publishing the Initial Article, Minkow posted two videos to Instagram and TikTok, respectively. Dkt. 1 at ¶ 14. These were titled "Fraud Minute with Barry: 'Lifestyles of the Rich and Fraudulent'" parts 1 and 2. *Id*. The two videos were viewed approximately a combined 10,180 times on Instagram and 23,500 times on TikTok. *Id*. at ¶ 16. In these videos, Minkow largely reiterates his allegations made in the Initial Article. *Id*. at Exs. 2, 3.

Osborne filed his Complaint on November 10, 2025. Osborne twice sought temporary restraining orders, both of which the Court denied. *See* Dkt. 30 at 2. The same day that the Court denied the second request, December 4, 2025, Minkow, pro se, filed a letter in opposition and raised several possible defenses, including that the Court lacked personal jurisdiction. Dkt. 9. Osborne moved for entry of default on December 22, 2025, which spawned a months-long briefing and motions duel. Dkts. 11, 14-15, 17-19.

On March 14, 2026, Minkow published a second blog post on LinkedIn, "An Inconvenient Truth: How AJ Osborne and Cedar Creek Capital Use Mob-Like

Tactics to Cover Up Material Misrepresentation and Fraud." ("Mob Article"). Dkt. 22-8. The Mob Article again accused Cedar Creek of material misrepresentations and fraudulent statements. *Id*. The article examined multiple properties in Oklahoma and one in Colorado. *Id*. Minkow then accused Osborne of using "mob-like tactics," namely retaining counsel, to "intimidate anyone who dares question the documented misrepresentations." *Id*. at 6.

Minkow followed the Mob Article up with six new video posts. Dkt. 22-7 Exs. B-E, K-L. These videos are titled "Another Fraudulent Company!!!" parts 1 through 5.[1] Like the videos following the Initial Article, these six new posts largely repeat and expound on the allegations made in the Mob Article.

On April 1, 2026, Osborne filed an emergency motion for a preliminary injunction. Dkt. 22. On May 4, 2026, the Court issued a memorandum decision and order denying Osborne's motion for entry of default. Dkt. 30. Additionally, liberally construing Minkow's December 4, 2025, letter, the Court recognized it as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2). *Id*. The Court ordered that Osborne had twenty-one days to respond to that motion, as well as to amend his motion for a preliminary injunction to address personal jurisdiction. *Id*. Minkow

[1] It appears that Minkow labeled two videos as Part 3.

had fourteen days from the filing of Osborne's amendment to respond, and Osborne then would have seven days to reply. *Id*.

Before the Court can address the merits of Osborne's request for a preliminary injunction, it must first determine whether it has jurisdiction over Minkow. *See Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("A federal court may issue the injunction if it has personal jurisdiction over the parties . . . ."). This Court does not.

## LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(2)

Under Rule 12(b)(2), a defendant may move for dismissal of an action for lack of personal jurisdiction. The plaintiff has the burden of proving that jurisdiction is appropriate. *Wells Cargo, Inc. v. Transport Ins. Co.*, 676 F.Supp.2d 1114, 1118 (D. Idaho 2009). If the motion is decided without an evidentiary hearing, the plaintiff need only make a prima facie showing of the jurisdictional facts. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2009). The court may consider evidence presented in affidavits to assist in adjudicating a Rule 12(b)(2) motion. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). The court examines the pleadings and affidavits to determine whether the plaintiff has made a prima facie showing. *Hill v. Union Pac. R.R. Co.*, 362 F.Supp.3d 890, 894 (D.

Idaho 2019). Uncontroverted allegations in the complaint must be taken as true, and conflicts in statements contained in affidavits must be resolved in the plaintiff's favor. *Id*.

**B. Specific Jurisdiction**

"In order to establish the existence of personal jurisdiction in a diversity case, the plaintiff must show (1) that the statute of the forum confers personal jurisdiction over the nonresident defendant, and (2) that the exercise of jurisdiction of accords with federal constitutional principles of due process." *Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987).

Federal courts ordinarily follow state law to determine the bounds of their jurisdiction over a party. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). However, "because Idaho's long-arm statute . . . allows a broader application of personal jurisdiction than the Due Process Clause, the Court need look only to the Due Process Clause to determine personal jurisdiction." *Hill*, 362 F.Supp.3d at 895.

"The Due Process Clause of the Fourteenth Amendment constrains a [s]tate's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citation omitted). To comport with due process, the nonresident defendant must have "certain minimum contacts" with the

forum, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

There are two species of personal jurisdiction: general and specific. General jurisdiction "comes into play when a defendant is essentially at home in the forum state." *Davis v. Cranfield Aerospace Solutions, Ltd.*, 71 F.4th 1154 (9th Cir. 2023) (internal quotation omitted). Even, on the limited submissions made by the parties, it seems clear that Minkow has acted so as to satisfy the requirements of general personal jurisdiction. Specific jurisdiction, on the other hand, "is exercised when a state asserts personal jurisdiction over a defendant in a lawsuit arising out of or related to the defendant's contacts with the forum state," and is dependent upon "the quality and nature of the defendant's contacts with the forum state in relation to the cause of action." *Hill*, 362 F.Supp.3d at 895.

The Ninth Circuit employs a three-prong test to analyze specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and

substantial justice, i.e., it must be reasonable.

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205-06 (9th Cir. 2006) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The plaintiff has the burden of satisfying the first two prongs. *Schwarzenegger*, 374 F.3d at 802. If the plaintiff succeeds in doing so, the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would be unreasonable. *Id*. (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

When a case sounds in tort, the Ninth Circuit evaluates the first prong under the purposeful effects test, derived from *Calder v. Jones*, 465 U.S. 783 (1984). *Yahoo! Inc*, 874 F.3d at 1069. This test requires that a defendant (1) commit an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017).

The Supreme Court clarified the precepts of the effects test in *Walden v. Fiore*. "The inquiry whether a forum [s]tate may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden*, 571 U.S. at 283-84 (quoting *Keeton v. Hustler Magazine*, 465 U.S. 770, 775 (1984)). The defendant's conduct must form the

necessary connection with the forum that constitutes the jurisdictional basis. *Walden*, 571 U.S. at 285. The plaintiff cannot be the sole link between the defendant and the forum. *Id*. In the context of intentional torts, exercise of jurisdiction must be based on intentional conduct by the defendant that creates the necessary contacts. *Id*. at 286.

## ANALYSIS

At issue here is the second prong of the effects test, whether Minkow expressly aimed his intentional act at Idaho. As defamation and intentional interference with prospective economic advantage are both intentional torts, the analysis for both claims is identical.

### A. Intentional Torts and Social Media

Osborne's claims arise from the two articles and eight videos that Minkow posted on social media. Determining whether a court can exercise personal jurisdiction over a defendant stemming from that defendant's posts publicly available on social media is a relatively new and developing subgroup of the courts' internet-based personal jurisdiction analyses.

#### 1. Social Media Defamation Cases

The Ninth Circuit addressed personal jurisdiction in a post-*Walden* social media-based defamation suit in *Janus v. Freeman*, 840 F. App'x. 928 (9th Cir. 2020), an unpublished memorandum disposition. In *Janus*, the plaintiff, a

California resident, sued Freeman, a Texas resident, in the Central District of California. *Id*. at 929. Freeman began to post allegedly defamatory material about Janus and his business, 17hats, onto social media after his wife took a job with 17hats in California and began a romantic relationship with Janus. *Id*. at 932.

Specifically, Freeman contacted 17hats' Director of Operations, pretending to be interested in a job, and sent messages over Facebook Messenger accusing Janus of using his company as a "personal matchmaking service." *Id*. at 933. These messages were visible to several employees. *Id*. Allegedly, on another occasion, Freeman, under the username "[Janus]_does_small_animals," posted a comment to a livestream Janus was hosting and being viewed by 17hats' employees and customers. *Id*. at 933. Freeman also made accusations to his estranged wife that Janus was being criminally investigated and had previously been accused of crimes. *Id*.

Applying *Walden*, the majority affirmed the district court's dismissal for lack of jurisdiction, stating that "the mere making of defamatory comments to persons known to be Californians is not sufficient, without more, to establish purposeful direction under *Walden*. What matters is the creation of "reputation-based effects" within California . . . and Janus's showing on this score is essentially nonexistent." *Id*. at 931.

However, *Janus* is only of limited guidance here. The crux of the majority's decision rests on the fact that Janus did not evince or even allege that Freeman's communications caused reputation-based effects sufficient to warrant haling Freeman into a California court. *Id*. In the instant case, Osborne has cleared that hurdle, as he has alleged that in addition to reputational harm, Minkow's defamatory statements have had a significant impact on investment in his business.[2]

### 2. Other Social Media Defamation Cases

Multiple other circuits have examined defamation in a social media context. "Those circuits have uniformly held that in determining whether the allegedly defamatory comments or information was directly aimed at the forum, the court must look to the defendant's focus, purpose, and/or intent in posting the information." *Moore v. Cecil*, 109 F.4th 1352, 1363 (11th Cir. 2024) (collecting cases).

Examining such cases, both pre- and post-*Walden*, the Eleventh Circuit concluded that the second prong of the effects test is satisfied when an out-of-state

---

[2] However, this, on its own, does not satisfy the requirements for the Court to exercise jurisdiction over Minkow. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 289

defendant "deliberately directs his posting at the plaintiff or at an audience in the forum state." *Id*. at 1364. However, the prong is not satisfied when "there is no evidence that the defendant posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state specifically." *Id*.

*Moore* stemmed from the 2017 Alabama senatorial special election. Moore, the Republican candidate, became embroiled in controversy after multiple women accused him of improper sexual conduct in the 1970s and 1980s, when the women were teenagers. *Id*. at 1356-57. After his election loss, Moore sued Cecil, the chairman of a Democratic-aligned political action committee, alleging that tweets posted by Cecil were defamatory. *Id*. at 1357. The tweets were replies to Republican political operatives and did not explicitly name Moore, but referred to a "pedophile" and "predator" running for office in Alabama. *Id*.

The district court determined that it did not have personal jurisdiction over the tweets because they were not aimed at Alabama, but rather were simply utilizing the allegations against Moore as a cudgel against Republicans on a national stage. *Id*. at 1358-59. The Eleventh Circuit affirmed. Drawing on other cases concerning the application of the effects test to social media, the Eleventh Circuit stated that "there is no evidence that the four tweets in question were directed at Alabama or that Cecil intended to target an Alabama audience as

opposed to his followers or a national audience generally." *Id*. at 1364. The court concluded that Moore failed to show that Alabama was the focal point of the tweets. *Id*.

Two cases from the Sixth Circuit with opposite outcomes from each other, both stemming from the Twitter posts of celebrity-cum-activist Kathy Griffin, are illustrative. In *Johnson v. Griffin*, 85 F.4th 429 (6th Cir. 2023), Johnson, the CEO of VisuWell, a Tennessee-based company, was filmed in the middle of a confrontation at a restaurant with a same-sex couple that was part of an overly boisterous high school prom group. *Id*. at 431. Griffin retweeted the clip to her two million followers, identifying Johnson as the CEO of VisuWell, tagging the company directly, and stating that he and his wife were residents of Tennessee. *Id*. Griffin later tweeted a photograph of Johnson, again identifying him by name and as a resident of Tennessee. *Id*. at 431-32.

VisuWell fired Johnson. *Id*. at 432. Griffin, ever thorough, responded to a tweet by Visuwell, inquiring whether VisuWell had removed Johnson from its board and promised that "the nation will remain vigilant" as to Johnson's employment status with VisuWell. *Id*. The Johnsons sued Griffin in Tennessee for several torts. *Id*. The district court dismissed for lack of personal jurisdiction. *Id*.

The Sixth Circuit reversed the district court, finding Griffin's actions more

similar to those of the journalists in *Calder* than those of the officer in *Walden*.

In *Calder*, journalists relied on California sources to write an article in a magazine with a particularly high circulation in California. *Calder*, 465 U.S. at 785. The allegedly libelous article concerned the activities within California of an actress who lived and worked in the state. *Id*. at 785, 788. The Supreme Court held that the journalists were subject to the jurisdiction of California courts because the "focal point" of the story and harm suffered by the actress was California. *Id*. at 789.

In *Walden*, a police officer at an airport in Georgia seized the cash of two professional gamblers from Nevada and California who were returning home from Puerto Rico. *Walden*, 571 U.S. at 279-80. The officer drafted an allegedly false or misleading probable cause affidavit, but the money was ultimately returned to the gamblers. *Id*. at 280-81. The gamblers sued in the District of Nevada, which dismissed for a lack of personal jurisdiction. *Id*. at 281. The Supreme Court, reversing the Ninth Circuit, held that the district court did not have jurisdiction, as the officer's actions all occurred in Georgia and had no jurisdictionally relevant contacts with Nevada. *Id*. at 288-89. The Supreme Court emphasized that the minimum contacts inquiry must focus on the defendant's contacts with the forum state. *Id*. at 291.

In *Johnson*, the Sixth Circuit concluded that Griffin "undoubtedly knew that the focal point of her tweets concerned Tennessee," based on her identification of the particular city and state that the Johnsons lived in, as well as her "intentional threats to VisuWell's Tennessee-based business." *Johnson*, 85 F.4th at 433. The Sixth Circuit noted that the Tweets had an impact in Tennessee, as not only had Johnson "lost his livelihood, but Visuwell also lost its leader and likely customers." *Id*. at 434.

Although Griffin argued that she disseminated her tweets generally, the Sixth Circuit pointed out that she sent communications directly to VisuWell by tagging it in her initial Tweet and responding to it in her later reply concerning Johnson's position on the board. *Id*. at 435. "Targeting Johnson and VisuWell in Tennessee, based exclusively on conduct in Tennessee, and urging action in response in Tennessee, tethered those effects to the forum." *Id*. (cleaned up).

In contrast, in *Blessing v. Chadrasekhar*, 988 F.3d 889 (6th Cir.), Kentucky high-schoolers who became the subject of national attention after a video of them and a Native American man in front of the Lincoln Memorial went viral sued a New Jersey doctor and Griffin for their tweets related to the incident. *Blessing*, 988 F.3d at 892-93. Griffin posted multiple tweets demanding that the students be identified, as well as other harassing tweets. *Id*. at 893.

In addition to the defendants' actions being outside of the purview of Kentucky's long arm statute, the Sixth Circuit concluded that exercise of jurisdiction would be violative of due process. *Id*. at 904. There was no evidence that the defendants posted their tweets intending to reach Kentucky specifically, as opposed to their followers generally. *Id*. at 906; *see also Johnson*, 85 F.4th at 434 ("Missing in *Blessing* were allegations that Griffin had intentionally targeted Kentucky when provoking efforts to harass the students.") Kentucky was not the focal point, as the alleged harm was not tethered to Kentucky, and plaintiffs would have experienced that same harm regardless of their location. *Id*. at 906-07.

Other district courts within the Ninth Circuit have applied a similar analysis to that articulated in *Moore* when analyzing specific jurisdiction in social media-based defamation suits. *See*, *e.g. E'Casanova v. Morrow*, 2021 WL 682058 *3 (D. Nev 2021) ("Nevada residents' ability to view Defendant's online content still does not indicate that Defendant expressly aims his conduct at Nevada; Plaintiff does not identify any evidence that Defendant specifically targets or solicits Nevada viewers . . . ."); *Westbrook v. Paulson*, 2021 WL 963486 *5 (W.D. Wash. 2021) ("Plaintiffs have proffered no allegations of, for example, Washington-specific marketing or advertising from which one could conclude that Defendants targeted Washington, as opposed to a wider audience generally."); *Patterson v. Baller Alert,*

*Inc.*, 2018 WL 11354104 *3 (C.D. Cal. 2018) ("Plaintiff fails to demonstrate that Defendants expressly aimed their internet activities at California, causing foreseeable harm. While Defendants' daily Instagram postings reach users in California, Plaintiff does not suggest that Defendants targeted California or any California resident.").

### B. Osborne has not Demonstrated Minkow Deliberately Directed His Posting at Osborne or Idaho, the Forum State

Informed by the decision of the Ninth Circuit in *Janus*, and by the decisions of its sister circuit courts, the pertinent question is whether Minkow's internet activity was expressly targeted or directed at an audience in Idaho. The Court concludes that it was not. The two blog posts and eight videos that are the basis of Osborne's claims do not constitute anything more than attenuated, incidental contacts.

#### *a. Minkow's Social Media Posts*

In the Initial Article, Minkow focuses on Cedar Creek Fund I, comprised of six self-storage properties. Minkow lists the street addresses, but not cities, states, or zip codes of these properties.[3] From Osborne's exhibits to his affidavit, the

[3] The Initial Article contains a hyperlink to Cedar Creek's portfolio. The hyperlink leads to the present-day site, not an archive from around the time of publication of the Initial Article, as properties acquired in 2026 are listed. The Fund I tab lists properties in Denver, Tulsa, and Englewood.

locations are:

1) 1577 West 121st Street, Jenks, Oklahoma ("121, OK Property")

2) 12321 South Memorial Drive, Bixby, Oklahoma ("Memorial, OK Property")

3) 4532 East 51st Street, Tulsa, Oklahoma ("51st, OK Property")

4) 12010 South Elm Street, Jenks, Oklahoma ("Elm, OK Property")

5) 1995 South Valentia Street, Denver, Colorado ("Valentia, CO Property")

6) 34111 South Irving Street, Englewood, Colorado ("Irving, CO Property") [4]

Dkt. 22-7 at 5.

Minkow continues to examine the Curtis, ID Property, again, not providing the city, state, or zip code. Ultimately, while an Idaho property is used as an example to illustrate Minkow's allegation that the fund is carrying excessive LTVs, the article cannot be considered to be an article primarily concerning actions occurring in Idaho.

In his first video, Minkow mentions that Osborne has "a big house, big car,

---

[4] The parties state in their briefing that there is a self-storage facility at 3411 South Irving Street, Boise, Idaho. However, a search of the Ada County Assessor's property search does not return any property bearing that address. In his affidavit, Osborne stated that there is a property in Englewood, Colorado in Fund I, but did not provide an address. Dkt. 22-7 at ¶ 15. The Arapahoe County, Colorado Assessor's property search returns a property with the address of 3411 South Irving Street being used as "Mini Storage." Accordingly, the Court will take notice of the respective assessors' property records. *See* Fed. R. Evid. 201(b)(2).

lots of bling," while footage from a video of a tour of Osborne's house posted publicly to YouTube plays. Minkow linked to the YouTube video that the footage comes from in the Initial Article. While the video itself identifies that Osborne lives in Eagle, Idaho, Minkow does not in either the Initial Article or his first video. In his first video, Minkow discusses the six assets comprising Fund I but does not provide any information as to location beyond street numbers and names.

Minkow's second video contains a reference to Idaho. Minkow does refer to Cedar Creek as "Cedar Creek Capital, of Idaho," with a map of Idaho behind him. Minkow also discusses the Curtis, ID Property, largely rehashing his analysis in the Initial Article, but does not identify the city or state that the property is located in.

After a few months' hiatus, Minkow published his second group of posts regarding Osborne and Cedar Creek, beginning with the Mob Article. The Mob Article discusses four properties—the Elm, OK Property; the 121, OK Property; the Memorial, OK Property; and the Valentia, CO Property. No mention of or reference to Idaho is present.

Minkow's third video generally repeats his overarching allegations and discusses companies such as Cedar Creek attempting to cow him through legal action. His fourth video focuses on the Elm, OK Property. Minkow does not

himself identify Oklahoma, but does mention Tulsa County, and displays a screenshot of a webpage stating that the property is in Oklahoma. The fifth video focuses on the Valentia, CO Property, though, again, Minkow does not identify Colorado, but puts text on screen that places the property in Colorado. In the sixth video, Minkow discusses Fund I, but does not discuss any particular property. The seventh video discusses the challenges that the self-storage industry has faced post-Covid and continues discussion of Fund I without examining any particular property.

Minkow's final video also references Idaho. Minkow states that Osborne "gobbled up" four properties in Boise, Idaho, and one property in Washington, D.C. in June 2022 "and had a $32 million cross-collateral loan." Minkow stated that he had hired experts who calculated the LTV of the five properties as between 112% and 120% in July 2022.

*b. Insufficient Minimum Contacts*

While Idaho is referenced to some extent in Minkow's posts, and Osborne is located in Idaho, Osborne has not made a prima facie showing that the Court has specific jurisdiction over Minkow.

To begin, there is a lack of any allegation that Minkow reached an Idaho

audience specifically, as opposed to his followers writ large.[5] Other circuits have routinely held that posting defamatory information online on its own is not enough to establish jurisdiction; there must be more to subject the poster to personal jurisdiction wherever the posting could be read. *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011). To determine what "'more' could create personal jurisdiction for such activities, courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id*.

Osborne does not allege that Minkow has an audience in Idaho, or that anyone in Idaho actually read or watched Minkow's posts. Osborne alleges only that he and his companies "have had investors express concern and hesitation with investing in new opportunities. To date, approximately $1.5 million has been withdrawn by potential investors due to Minkow's defamatory statements." Dkt. 1 at ¶ 20. Cedar Creek has over 600 investors, but the geographic distribution of these investors is not specified. The fact that Cedar Creek has had investments pulled cannot provide a basis for finding that Minkow targeted Idaho when the

[5] In fact, Osborne's Complaint implies that Minkow's posts were disseminated to all of his followers, regardless of their geography, as Osborne points out that Minkow has thousands of followers on LinkedIn, and tens of thousands on Instagram and TikTok.

locations of the investors are unknown. *See Shrader*, 633 F.3d at 1246 ("There is no basis for concluding that [defendant] targeted his post at [the forum state]. On the contrary, every indication is that [defendant] targeted the post at a nation-wide or world-wide audience of market traders with no inherent interest in or tie to [the forum state].")

Further, there is no evidence that Minkow's posts were in fact targeted at Idaho specifically. Minkow does not make an appeal to Idahoans or frame his allegations as an Idaho-specific investigation. Though Minkow does acknowledge that Cedar Creek is an Idaho company, references the purchase of four properties in Boise, and analyzes the Curtis, ID Property, Minkow's focus is not exclusively, or even primarily, on properties in Idaho.

Minkow examines multiple properties in Oklahoma and Colorado in greater depth. Although Osborne alleges that he suffered harm in Idaho, the withdraw of investors from Cedar Creek, Idaho is not the focal point of Minkow's posts, and this alleged harm is not tethered to Idaho—Osborne does not provide evidence that the investors are particularly concentrated in Idaho. *See Blessing*, 988 F.3d at 906-07.

Osborne points to *Russell v. Samec* 2020 WL 7048403 (W.D. Wash. 2020) in support of his position. However, *Russell* is distinguishable, and in fact serves as

a useful contrast to this case. In *Russell*, the plaintiff, a Washington resident, sued two defendants in Washington for defamation and other allegedly tortious acts. *Id*. at *1. One of the defendants, Bishop (a Florida resident), acting under the belief that Russell was defrauding investors, posted allegedly false statements about Russell on social media. *Id*. Bishop also allegedly contacted prospective out-of-state investors in Russell's attempted development of mineral rights on a property in Washington, and made defamatory statements about Russell to the investors, causing them to pull out of the deal. *Id*.

Bishop, citing *Shrader v. Biddinger*, argued that posting defamatory comments on the internet, without more, does not subject the poster to personal jurisdiction. *Id*. at *5. However, the court found that the defendant had done more than simply post online—the defendant had contacted Washington media outlets, identified plaintiff's Washington businesses in postings, and targeted plaintiff's investment project located within Washington by *directly* contacting investors. *Id*. at *5-6. Additionally, Russell stated "that people—almost all of whom live in Washington—have contacted him because they saw the publications or heard about them directly" from the defendants. *Id*. at *5. Russell, unlike Osborne, could point to specific acts by the defendant targeting the forum state.

Osborne also cites to *Scofield v. Guillard*, 2023 WL 7496739 (D. Idaho

2023) in support. In *Scofield*, the court determined that it had specific jurisdiction over Guillard, a Texas resident, who had posted over one hundred videos to TikTok alleging that a professor at the University of Idaho was having an affair with a student at the University of Idaho, and either herself murdered, or directed someone else to murder, four University of Idaho students to cover the affair up. *Id*. at *1. Examining the express aiming prong of the effects test, the court concluded that it was satisfied because the defendant accused an Idaho professor and resident of having an affair with a student in Idaho and then killing four students in Idaho.

While Guillard's posts, like Minkow's, may have been disseminated to anyone with a TikTok account, her posts were entirely related to an exclusively Idaho-based occurrence. By comparison, Osborne's broader investigation and posts involved, what he alleges, are multi-state occurrences of fraud. Guillard's actions are comparable to those that gave rise to personal jurisdiction in *Johnson*: she targeted an individual in Idaho based exclusively on crimes that occurred in Idaho and made (absurd) allegations that the individual had committed those crimes while the case was actively being investigated. *See Johnson*, 85 F.4th at 435. Rather, like the plaintiffs in *Blessing*, Osborne has not demonstrated that

Minkow intentionally targeted Idaho in his posts.[6]

Ultimately, Minkow posted allegedly defamatory material that allegedly harmed Osborne and his business to social media, visible to anyone who follows Minkow, or happens across his content, without consideration or regard for geography. There is no evidence that Minkow targeted Idaho specifically; nor is there evidence that Minkow specifically targeted Cedar Creek's investors.

Osborne may suffer injury in Idaho, but "mere injury to a forum resident is not a sufficient connection to the forum . . . . an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum state." *Walden*, 571 U.S. at 290. "It was not sufficient that the [plaintiff] had 'strong forum connections' and 'suffered foreseeable harm' in the forum state." *Blessing*, 988 F.3d at 904 (quoting *Walden*, 571 U.S. at 289.) A defendant's actions in one state do not create sufficient contacts with the forum state simply because the defendant directs his conduct at a plaintiff whom the defendant knows has connections to the forum state. *Walden*, 571 U.S. at 289.

---

[6] Osborne also cites *Hawks v. Seery*, 2023 WL 5206135 (D. Ariz. 2023) in support. However, this case is distinguishable, as the defendant physically returned to Arizona to deliver a "love card" to the plaintiff, and the plaintiff presented "evidence that the statements Defendant published were aimed at Arizona . . . concerned [plaintiff's] activities in Arizona, and were read by Arizona citizens resulting in harm to [plaintiff's] reputations and livelihood in Arizona." *Id*. at *5.

While Osborne does point out the perverse incentive of defaming someone on social media to as large an audience as possible, so as to inoculate against tethering the action to any particular forum, he is incorrect that it leaves a plaintiff without any recourse. In a case such as this, where diversity exists, a defendant can be sued in federal court in their state of residence. Even if diversity does not exist, a plaintiff can still file suit in state court.

Despite being invited by the Court to do so, Osborne has not made a prima facie showing that the Court can exercise specific jurisdiction over Minkow.

**C. Transfer Pursuant to 28 U.S.C. § 1631**

"Under a provision of the Federal Courts Improvement Act, 28 U.S.C. § 1631, if a court finds that there is a want of jurisdiction the court shall transfer the action to any other such court in which the action could have been brought 'if it is in the interest of justice.'" *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990). Transfer is normally in the interest of justice because dismissal of an action that could be brought elsewhere is "time-consuming and justice-defeating." *Id*. (cleaned up) (internal quotation omitted).

This is the case here. Osborne has a long-pending preliminary injunction application that has been fully, and supplementally, briefed. Minkow is a resident of Nevada, and therefore beholden to the exercise of general jurisdiction by the

District of Nevada. *See Hueter v. Kruse*, 576 F.Supp.3d 743, 766 (D. Haw 2021) (citing *Daimler AG*, 571 U.S. at 133 n.11). Thus, rather than obligate Osborne to refile and restart the process, the Court, in the interest of justice, will transfer this case to the docket of the District of Nevada.

**ORDER**

**IT IS ORDERED that:**

1. Defendant Barry Minkow's Motion to Dismiss (Dkt. 9) is **GRANTED IN PART AND DENIED IN PART**. The Motion is granted to the extent that the Court concludes that it lacks specific personal jurisdiction over Defendant Minkow. The Motion is denied to the extent that the Court elects to transfer the case under 28 U.S.C. § 1631 rather than dismiss the action.

2. Because it lacks jurisdiction over Defendant Minkow, the Court will not rule on any currently-pending motions (Dkts. 22, 23, 26, 37).

2. The Clerk of the Court is directed to **TRANSFER** this case to the United States District Court for the District of Nevada.

DATED: August 4, 2026

B. Lynn Winmill
U.S. District Court Judge